# EXHIBIT 1

# STATE OF NORTH CAROLINA

FILED

___Mecklenburg___ County

2016 MAY -9 PH 1: 55

MECKLENBURG

BY:

File No. 16CVS 8609

## GENERAL
## CIVIL ACTION COVER SHEET
☒ INITIAL FILING ☐ SUBSEQUENT FILING

Rule 5(b), General Rules of Practice For Superior and District Courts

| Name And Address Of Plaintiff 1 | |
|---|---|
| Timothy Scott Bridges<br>c/o David S. Rudolf<br>225 E. Worthington Avenue<br>Charlotte NC 28203 | |

| Name And Address Of Plaintiff 2 | |
|---|---|

**Name And Address Of Attorney Or Party, If Not Represented (complete for initial appearance or change of address)**

David S. Rudolf and Sonya Pfeiffer
225 E. Worthington Ave., Suite 200
Charlotte, NC 28203

## VERSUS

| Name Of Defendant 1 | |
|---|---|
| City of Charlotte | |

| Telephone No. | Cell Telephone No. |
|---|---|
| 704-333-9945 | |

| NC Attorney Bar No. | Attorney E-Mail Address |
|---|---|
| 8587 | dsrudolf@rudolfwidenhouse.com |

Summons Submitted ☐ Yes ☒ No

☒ Initial Appearance in Case ☐ Change of Address

| Name Of Defendant 2 | |
|---|---|
| Larry Snider, in his individual and official capacities and supervisory capacity | |

Name Of Firm
Rudolf Widenhouse

FAX No.
704-335-0224

Summons Submitted ☐ Yes ☒ No

Counsel for
☒ All Plaintiffs ☐ All Defendants ☐ Only (List party(ies) represented)

☒ Jury Demanded In Pleading
☐ Complex Litigation

☐ Amount in controversy does not exceed $15,000
☐ Stipulate to arbitration

## TYPE OF PLEADING

(check all that apply)

☐ Amend (AMND) *Assess Motions Fee (SEE NOTE)*
☐ Amended Answer/Reply (AMND-Response) *Assess Motions Fee (SEE NOTE)*
☐ Amended Complaint (AMND) *Assess Motions Fee*
☐ Answer/Reply (ANSW-Response) *(SEE NOTE)*
☐ Change Venue (CHVN) *Assess Motions Fee*
☒ Complaint (COMP)
☐ Confession Of Judgment (CNFJ)
☐ Consent Order (CONS)
☐ Consolidate (CNSL) *Assess Motions Fee*
☐ Contempt (CNTP) *Assess Motions Fee*
☐ Continue (CNTN) *Assess Motions Fee*
☐ Compel (CMPL) *Assess Motions Fee*
☐ Counterclaim (CTCL) *Assess Court Costs*
☐ Crossclaim (List On Back) (CRSS) *Assess Court Costs*
☐ Dismiss (DISM) *Assess Court Costs*
☐ Exempt/Waive Mediation (EXMD) *Assess Motions Fee*
☐ Extend Statute Of Limitations, Rule 9 (ESOL) *Assess Motions Fee*
☐ Extend Time For Complaint (EXCO) *Assess Motions Fee*

NOTE: *See Side Two for a list of motions not subject to the motions fee.*

(check all that apply)

☐ Failure To Join Necessary Party (FJNP) *Assess Motions Fee*
☐ Failure To State A Claim (FASC)
☐ Improper Venue/Division (IMVN) *Assess Motions Fee*
☐ Intervene (INTR) *Assess Motions Fee*
☐ Interpleaded (INPL) *Assess Motions Fee*
☐ Lack Of Jurisdiction (Person) (LJPN) *Assess Motions Fee*
☐ Lack Of Jurisdiction (Subject Matter) (LJSM) *Assess Motions Fee*
☐ Rule 12 Motion In Lieu of Answer (MDLA) *Assess Motions Fee*
☐ Sanctions (SANC) *Assess Motions Fee*
☐ Set Aside (OTHR) *Assess Motions Fee*
☐ Show Cause (SHOW) *Assess Motions Fee*
☐ Transfer (TRFR) *Assess Motions Fee*
☐ Third Party Complaint (List Third Party Defendants on Back) (TPCL)
☐ Vacate/Modify Judgment (VCMD) *Assess Motions Fee*
☐ Withdraw as Counsel (WDCN) *Assess Motions Fee*
☐ Other (specify and list each separately)

NOTE: *Assess fee only if court permission is required to amend.*

## CLAIMS FOR RELIEF

☐ Administrative Appeal (ADMA)
☐ Appointment Of Receiver (APRC)
☐ Attachment/Garnishment (ATTC)
☐ Claim And Delivery (CLMD)
☐ Collection On Account (ACCT)
☐ Condemnation (CNDM)
☐ Contract (CNTR)
☐ Discovery Scheduling Order (DSCH)

☐ Injunction (INJU)
☐ Medical Malpractice (MDML)
☐ Minor Settlement (MSTL)
☐ Money Owed (MNYO)
☐ Negligence - Motor Vehicle (MVNG)
☐ Negligence - Other (NEGO)
☐ Motor Vehicle Lien G.S. 44A (MVLN)

☐ Limited Driving Privilege - Out-of-State Convictions (PLDP)
☐ Possession Of Personal Property (POPP)
☐ Product Liability (PROD)
☐ Real Property (RLPR)
☐ Specific Performance (SPPR)
☒ Other (specify and list separately)
Wrongful Imprisonment and Civil Conspiracy

| Date | Signature Of Attorney/Party |
|---|---|
| May 9 2016 | |

NOTE: *All filings in civil actions shall include as the first page of the filing a cover sheet summarizing the critical elements of the filing in a format prescribed by the Administrative Office of the Courts, and the Clerk of Superior Court shall require a party to refile a filing which does not include the required cover sheet. For subsequent filings in civil actions, the filing party must either include a General Civil (AOC-CV-751), Motion (AOC-CV-752) or Court Action (AOC-CV-753) cover sheet.*
(Over)

AOC-CV-751, Rev. 6/11, © 2011 Administrative Office of the Courts

**DO NOT CHARGE MOTIONS FEE**
Assess Costs (COST) Including Attorney's Fees (ATTY)
Implementation Of Wage Withholding In Non-IV-D Cases (OTHR)
Modification Of Child Support In IV-D Actions (MSUP)
Notice Of Dismissal With Or Without Prejudice (VOLD)
Petition To Sue As Indigent (OTHR)

**DO NOT CHARGE MOTIONS FEE. FEES IN G.S. 7A-308 APPLY**
Assert Right Of Access (ARAS)
Substitution Of Trustee (Judicial Forclosure) (RSOT)
Supplemental Procedures (SUPR)

**DO NOT CHARGE MOTIONS FEE. OTHER FEES APPLY**
Motion For Out-of-State Attorney To Appear In NC Courts In A Civil Or Criminal Matter (Out Of State Attorney/Pro Hac Vice Fee)
Request For Subpoena By Out-Of-State Attorney

| No. | ☐ **Additional Plaintiff(s)** |
|-----|-------------------------------|
| | |
| | |
| | |
| | |
| | |

| No. | ☒ **Additional Defendant(s)** ☐ **Third Party Defendant(s)** | **Summons Submitted** |
|-----|------------------------------------------------------------|----------------------|
| 3 | Cheryl Horner, in her individual and official capacities | ☐ Yes ☒ No |
| 4 | Elinos Whitlock, in his individual and official capacities | ☐ Yes ☒ No |
| 5 | Kathleen Ramseur, in her individual and official capacities | ☐ Yes ☒ No |
| | | ☐ Yes ☐ No |
| | | ☐ Yes ☐ No |

*Plaintiff(s) Against Whom Counterclaim Asserted*

| |
|---|
| |
| |
| |

*Defendant(s) Against Whom Crossclaim Asserted*

| |
|---|
| |
| |

AOC-CV-751, Side Two, Rev. 6/11
© 2011 Administrative Office of the Courts

FILED

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION

CASE NO.: 16 CVS 8609

| | |
|---|---|
| TIMOTHY SCOTT BRIDGES,<br><br>    Plaintiff,<br><br>      vs.<br><br>CITY OF CHARLOTTE, LARRY<br>SNIDER, in his individual and official<br>capacities and in his supervisory capacity<br>as the Capt. in charge of the Felony<br>Investigations Bureau of the Charlotte<br>Police Department, CHERYL HORNER,<br>in her individual and official capacities,<br>ELINOS WHITLOCK, in his individual<br>and official capacities, and KATHLEEN<br>RAMSEUR, in her individual and official<br>capacities,<br><br>    Defendants. | **COMPLAINT**<br>(Jury Trial Demanded) |

Plaintiff TIMOTHY SCOTT BRIDGES, through his attorneys, David Rudolf and

Sonya Pfeiffer, complains of Defendants CITY OF CHARLOTTE, LARRY SNIDER,

CHERYL HORNER, ELINOS WHITLOCK and KATHLEEN RAMSEUR as follows:

## INTRODUCTION

1.      On October 5, 2015, DNA testing exonerated Timothy Scott Bridges of a

1989 rape.  Mr. Bridges had served twenty-five years in the prisons of North Carolina,

from the age of twenty-three until the age of forty-eight, for a crime he did not commit.

1

On February 16, 2016, the Mecklenburg County District Attorney's Office voluntarily dismissed all charges against him with prejudice.

2.     While he was wrongfully imprisoned, Mr. Bridges lost the prime years of his life -- years during which he would have settled down, married and started his own family.  He also lost both of his grandmothers, his aunt, two uncles, his father, and his mother, all of whom died while he was serving this wrongful sentence.  He witnessed stabbings, a riot between black and Indian prisoners, and rapes.  Other inmates tried to sexually assault him multiple times.   For twenty-five years Tim Bridges was forced to live in a nightmare.

3.     This nightmare was not the result of accident, mistake or happenstance.  It was the result of willful and malicious misconduct on the part of officers employed by the Charlotte Mecklenburg Police Department ("CMPD").  These officers, who were sworn to uphold the law, instead hid exculpatory evidence from the Mecklenburg County District Attorney, and fabricated evidence that was used to convict Mr. Bridges.

4.     Nor was this the only instance in which CMPD officers hid exculpatory evidence from the District Attorney's office during this time period.   During the late 1980's and the early 1990's, members and supervisors of the Felony Investigation Bureau ("FIB") of the CMPD intentionally failed to provide such evidence to the District Attorney's office in other cases as well.

5.     As a result of the misconduct of CMPD officers in this case, Tim Bridges was subjected to the relentless stress and fear that are daily features of prison life for twenty-five years.  But in addition, whoever actually committed this horrendous crime,

2

raping and beating an 83-year old handicapped woman, remained free to prey on other elderly women. And, in fact, there was a series of such rapes in the same area while the police were manufacturing evidence against Mr. Bridges.

6.     The misconduct by CMPD investigators deprived Tim Bridges of a fair trial and of a fair opportunity to defend himself from these false charges. Mr. Bridges brings this suit to seek redress for the injuries done to him and to hold the defendants accountable for their misconduct.

## PARTIES

7.     Plaintiff Timothy Scott Bridges is a resident of Mecklenburg County.

8.     Defendant City of Charlotte is a municipal corporation organized under the laws of the State of North Carolina. Upon information and belief, the Charlotte Police Department merged with the Mecklenburg County Police Department in 1993 to form the Charlotte-Mecklenburg Police Department (hereinafter referred to jointly as the "CMPD"). The Charlotte Police Department and its successor, the CMPD, was at all times pertinent to this action a department of the defendant City of Charlotte.

9.     Defendant Larry Snider was at all times relevant to this Complaint employed as the Captain in charge of the FIB of the CMPD, and was acting under color of state law within the scope of his employment.

10.     Defendant Cheryl Horner was at all times relevant to this Complaint employed as an investigator for the FIB of the CMPD, and was acting under color of state law within the scope of her employment.

3

11.     Defendant Elinos Whitlock was at all times relevant to this Complaint a "trace evidence analyst" employed by the Crime Laboratory of the CMPD, and was acting under color of state law within the scope of his employment.

12.     Defendant Kathleen Ramseur was at all times relevant to this Complaint a fingerprint analyst employed by the Crime Laboratory of the CMPD, and was acting under color of state law within the scope of her employment.

### JURY TRIAL DEMAND

13.     Timothy Bridges hereby demands a trial by jury on all issues and claims set forth in this Complaint.

### FACTS

### I.     The Rape and Assault of Modine Wise

14.     On May 14, 1989, which was Mothers' Day, Modine Wise was beaten and raped in her home in North Charlotte. Ms. Wise was 83 years old, and was confined to a wheelchair. Her daughter-in-law found her the next afternoon, naked and semi-conscious. Nothing appeared to be missing from the house. A purse containing money was still pinned to her torn and bloody dress.

15.     Ms. Wise was unable to provide the police with much detail about the perpetrator. About all she consistently said was that the perpetrator was a young white male with long curly hair that was either blond, blondish brown or brown. However, Ms. Wise *repeatedly told the police that she could identify him if shown a photo.*

4

## II.    The Investigation - May and June of 1989

16.    A canvas of the neighborhood failed to turn up any leads.  Although a neighbor reported seeing a person generally fitting the description of the perpetrator in an alley behind Ms. Wise's house on the night of May 14, the neighbor did not see his face, and could provide no details of his appearance other than the length and color of his hair and his clothing.

17.    The crime scene inside the house was bloody, and the police processed it for any potentially useful evidence.  They found a pack of Salem Lights (Ms. Wise did not smoke), a men's jacket on the bed, a pair of men's socks in the bathroom, a pair of glasses that did not belong to Ms. Wise on a dresser next to the bed, and various other items that were either torn, bloody, or both.  The most significant evidence found was a bloody palm print near the light switch on a wall in the bedroom where the attack occurred.  The palm print did *not* belong to Modine Wise.

18.    The crime generated a great deal of anxiety in the neighborhood, one in which a number of elderly women lived, and the police were under pressure to solve it as quickly as possible.  The CMPD officers who had regular informants in the area spoke to them seeking information about the crime.  Although a number of names were suggested as possibilities, no significant information was obtained from these informants in the weeks following the crime.

19.    With only a general description to work from, the police focused on virtually every young male with long light-colored hair who frequented that neighborhood.  The palm prints of approximately fifty young males generally fitting the

5

description, including Tim Bridges and his brother, were ultimately sent to the Charlotte Police Department Crime Lab for analysis. None matched the palm print found on the wall. Tim Bridges was excluded by the Crime Lab as the source of the bloody palm print.

20.     During the early stages of the investigation, defendant Horner spoke with her immediate supervisor, Sgt. Cook, about showing Ms. Wise photos of the potential suspects who had been identified up to that time. Horner and Cook decided that "it would not be a good idea to show the victim any photographs as far as any of these possible suspects *at this time* as there is no firm suspect in this case." There was no indication in the notes of this conversation that Ms. Wise's eyesight had been adversely affected by the crime or that she could not identify a photo of the perpetrator -- only that a photo lineup was premature.

### III.     Ronald Eugene Kirkland Emerges as a Suspect

21.     Perhaps the most promising suspect developed during the first weeks of the investigation was not a local known to the police or their street informants. Ronald Eugene Kirkland lived in Gaston County, although during the month of May 1989 he had been working as a painter in Charlotte. Kirkland was arrested on June 7, 1989 for the burglary and rape of two elderly women in their homes in Gaston County in May 1989. He had also been charged with kidnapping and assault with a deadly weapon with intent to kill inflicting serious injury.

22.     On June 21, 1989, an article appeared in the Charlotte Observer entitled "Police Ask for Help on Assault." The article noted that the police had been "stymied" in their investigation and asked for the public's help in finding the person who had raped

6

Ms. Wise. The perpetrator was described as "a slender white male, 15-18 years of age, 5 feet 6 to 5 feet 8, with shoulder length blond hair."

23.     That same day, a detective from the Gaston City Police Department who had read the Observer articles called the FIB of the CMPD. He reported that Ronald Eugene Kirkland "has done 3 old women in Gaston Co," and that Kirkland was in Charlotte during May. Kirkland was described as 5'7" with a thin build and sandy hair down to his shoulders. He smoked menthol cigarettes. Although he was twenty-one years old, he "looks like a kid."

24.     On June 22, 1989, an unknown investigator from the CMPD went to Gaston County to talk to the detective. He was told that during May 1989, Kirkland had been working as a painter in Charlotte. The CMPD investigator was also told that on May 23, 1989, just nine days after the Modine Wise rape, the Gaston police had searched Kirkland's room, and had found a tee shirt, blue jeans, a blue baseball cap, and white Adidas tennis shoes. All of these items had blood on them. The CMPD investigator was also told that Kirkland had engaged in sex with his own mother.

25.     The CMPD investigator had brought an 8x10 photo of the bloody palm print with him to Gaston County. When the Gaston County detective looked at the photo, he told the CMPD investigator he believed the palm print in the photo was larger than Kirkland's. Based on this off-the-cuff opinion of a photo, defendant Horner never followed up on any of the information about Kirkland. She did not interview him, she did not have the blood found on his clothing compared to Ms. Wise's blood, and she did not have Ms. Wise view a photo lineup containing a picture of Kirkland. Instead, based

7

upon unreliable informants who only came forward with information months after the crime, defendant Horner zeroed in on Tim Bridges.

**IV.    The Investigation Focuses on Tim Bridges – August 1989**

26.    During the months of May through July of 1989, Charlie Walker, a CMPD plainclothes officer who worked in the vicinity of Ms. Wise's house, had been in contact with his regular informants seeking information about the rape.  His regular informants included Christopher "Matt" Donaldson, Clarence Neal Hamilton, and Vicky Jones. None of these individuals, who were all drug addicts with lengthy records, had provided any information about the Wise rape during these months, although they saw Walker in the neighborhood frequently.

27.    Matt Donaldson was a 16-year old male prostitute who shot cocaine and had been arrested twice in July 1989, once on July 14 and again on July 25, for loitering for the purpose of committing a crime against nature.  He had previously been arrested for crimes against nature.  During the months of June and July 1989, he had been observed by police officers "walking the streets" in the area near Modine Wise's residence, and had been considered a suspect in several break-ins in that area.  Donaldson fit the description of the Wise perpetrator.

28.    On August 2, 1989, Matt Donaldson's father advised a CMPD officer that his son, while high on drugs, had claimed Tim Bridges had committed the Wise rape.

29.    On August 4, 1989, defendant Horner interviewed Matt Donaldson about the Modine Wise rape. Donaldson told Horner that he had "heard" that Tim Bridges had committed the rape, and that he "thinks Tim is your suspect." Donaldson told Horner he

8

had never seen Tim Bridges with any injuries to his hands or blood on his clothes, nor had he ever seen Bridges in possession of any yellow valiums (pills the police knew had been taken from Wise's house). Donaldson told Horner that Bridges smoked Marlboro Lights, Marlboros, and Newport cigarettes. He did not smoke Salem or Salem Lights. Following this interview, Horner had Donaldson's palm prints checked against the palm print found at the scene of the Wise rape. They came back negative, as had Tim Bridges' palm prints.

30.    On August 8, 1989, Investigator Ray Carlton of the FIB interviewed Eddie Moss, who was Matt Donaldson's close friend. Moss was also a drug addict and male prostitute who fit the description of the Wise perpetrator and frequented the area of the crime. Moss told Carlton he had "heard" that either Steven Sowell (aka "Pork Chop") or Tim Bridges had committed the Wise rape. Carlton told Moss he would "get him money if he got me something we could work with." After being given this incentive, Moss said he had "heard" it was Tim Bridges.

31.    In late August 1989, Horner advised CMPD officers who had seen Donaldson and Moss "trolling" for homosexual males to stop them and threaten to "lock them up," in order to "give us some leeway [*i.e.* leverage] with them ... 'You talk to us **about Tim** and we won't charge you with loitering.'" She further told CMPD officer Ray Carlton, "you and I need to re-interview Donaldson. After tonight, he may break."

32.    On September 5, 1989, defendant Horner submitted a Crime Analysis Report to the FBI. She indicated there were no suspects in the Wise rape at that time.

9

The section entitled "Identified Offender Information" was left blank. Horner noted there was little ransacking and that *robbery was not the motive* for the crime.

33. On September 7, 1989, defendant Walker brought Donaldson in to be interviewed by Horner. Donaldson again told Horner that he had only "heard" people say Tim Bridges had committed the Wise rape. He claimed that these people included Eddie Moss and Vicky Jones. Donaldson also told Horner that Clarence Neal Williams was Tim Bridges' best friend, but he did *not* tell Horner he had heard Williams say anything about the rape.

34. On September 13, 1989, defendant Horner interviewed Kim Fish and Eddie Moss. Fish, who had dated Bridges a year and one-half earlier, told Horner that the "talk on the street" was that either Bridges or Steven Sowell had committed the crime. She also told Horner that Bridges "is really a "soft-hearted guy," and that she had never seen him beaten or scratched up. She said that Vicky Jones did not like Bridges, and that she wouldn't believe what Jones said about him. Moss told Horner that he had "heard" that Bridges or Steven Sowell had committed the crime, that he didn't like Bridges, but that he did not think either Bridges or Sowell had committed the rape.

35. On September 13, 1989, Clarence Neal Williams, who also fit the description of the suspect in the Wise case, was arrested for Crime Against Nature. That same day, CMPD officer Ray Carlton interviewed Williams. Williams allegedly told Carlton that on September 8, 1989, (the day after Horner had interviewed Donaldson about the Wise rape), Bridges had just casually volunteered to him, while walking down

10

the street, that he (Bridges) had committed the rape. Williams was ultimately sentenced to probation for the September 13 charge, despite a lengthy record.

36.     On September 14, 1989, defendants Horner and Walker interviewed Vicky Jones, a long-time informant for Walker, at the Law Enforcement Center. She claimed that in July 1989, while driving a car by a street corner, she heard Bridges (who was standing on the corner) say to Donaldson "yeah man, that was me." Jones further claimed Bridges subsequently got into the car she was driving and admitted to raping Ms. Wise. She also told Horner and Walker that she knew a fact that had not been publicly disclosed - that Ms. Wise had a colostomy bag. But Jones told Horner and Walker she heard this *not* from Bridges, but from Eddie Moss and another Walker informant, Rusty Rainey.

37.     Although Jones was a regular informant for officer Walker and had seen Walker frequently before September 14, 1989, she had never provided any information about the Modine Wise rape to Walker before September 14.

38.     On September 14, 1989, Moss and Donaldson were again interviewed. Moss again stated he had never talked to Bridges about the Wise rape, although he had "heard" Bridges did it. Donaldson again stated he had only "heard" that Bridges committed the rape. He denied that Bridges had said anything to him about the rape.

39.     On September 15, 1989, defendant Horner interviewed Modine Wise. She told Horner *she could identify the person who had raped her*. Despite this, Horner did not show her any photo lineup containing a picture of Tim Bridges.

11

## V. Ronald Kirkland Surfaces Again

40. On or about October 18, 1989, defendant Horner was informed that Ronald Kirkland had been bragging in jail about committing the Modine Wise rape. Horner knew Kirkland matched the description of the Wise perpetrator, had been identified by a Gaston County investigator as a suspect in the Wise rape shortly after that rape, had been working in Charlotte in May 1989, had blood on his clothes when his room was searched in May 1989, and was still facing multiple charges in Gaston County for raping elderly women during May 1989.

41. Despite this, defendant Horner did not interview Kirkland, did not have the blood found on Kirkland's clothes compared to Modine Wise's blood, did not have Kirkland's palm print taken and compared by the CMPD crime lab to the bloody palm print found at the scene, and did not show Modine Wise a photo lineup containing a picture of Kirkland. Defendant Horner simply ignored all the evidence that pointed to Ronald Kirkland as the perpetrator of the Modine Wise rape.

## VI. The Arrest of Timothy Bridges

42. On January 8, 1990, Matt Donaldson was convicted of prostitution and of possession of drug paraphernalia. He was sentenced to probation.

43. On January 22, 1990, Officer Walker interviewed Matt Donaldson again about the rape of Ms. Wise. For the first time, he claimed in this interview that in August 1989, when he was with Clarence Neal Williams, James Thompson and Tim Bridges, he heard Bridges tell Williams that he had committed the Modine Wise rape.

12

44. On March 6, 1990, defendant Horner called the nursing home to check on Ms. Wise's condition. She was told that Ms. Wise was "*much* better" and was "up and around." Despite this, Horner did not go to the nursing home to show Ms. Wise a photo spread containing a picture of Tim Bridges.

45. On or before March 20, 1990, defendant Horner prepared a "Prosecution Summary" for the Mecklenburg County District Attorney's office. In that Summary, Horner claimed that the victim had not been able to identify Bridges because her eyesight had been damaged in the attack, but that "her consistent description matches Δ."

46. Both of these statements to the District Attorney's office were false. Modine Wise's descriptions of the perpetrator had not been consistent and did not always match Mr. Bridges. Moreover, Ms. Wise's eyesight did *not* prevent her from being able to identify the perpetrator in a photo lineup. Indeed, defendant Horner had written a report on November 17, 1989, after Horner had zeroed in on Tim Bridges, stating that Ms. Wise was alert and watching TV, *had identified several photos in a magazine*, and *had read some words in the magazine.* Despite this, Horner never showed Ms. Wise any photo spread containing a picture of Tim Bridges.

47. On March 27, 1990, Timothy Bridges was arrested for the rape and assault of Ms. Wise. The only evidence against him at this point were the inconsistent statements of the three drug addict informants, who had waited months to provide information to the police officers for whom they regularly informed. The District Attorney knew their credibility was questionable at best. As she told the jury during the

13

trial, "I wish we could pick and choose our witnesses because I would have picked and chosen some better than those folks, but we don't get to pick them."

## VII. Tim Bridges Immediately Asserts His Innocence

48.     Immediately after his arrest, Mr. Bridges waived his rights and was interviewed by CMPD Investigator "Buzz" Boothe, by Investigator Ray Carlton, by officer Charlie Walker, and by defendant Horner. He adamantly denied any involvement in each interview, offered to take a polygraph, voluntarily provided saliva for DNA analysis, and voluntarily provided head hair, pubic hair, facial hair, arm hair and leg hair for comparison to the hair found at the crime scene. He told the investigators "I'm going to do everything I can to prove my innocence." He never wavered from that statement during the twenty-five years he spent in prison. For all that time, Mr. Bridges insisted he was innocent.

49.     On March 28, 1990, defendant Horner prepared a Media Briefing Sheet. She noted at the end of this document, in capital letters "THIS CASE IS NOT RELATED TO THE CURRENT RAPES OF ELDERLY WOMEN ON THE EAST SIDE OF CHARLOTTE AND MECKLENBURG COUNTY." In short, despite months of investigating, there was no evidence that Timothy Bridges had targeted and/or raped elderly women in Charlotte. Someone else had. Although defendant Horner had written in a report to the FBI in September 1989 that robbery was *not* the motive for the attack on Modine Wise, she now asserted that robbery *was* the motive.

50.     On March 29, 1990, defendant Horner wrote a memorandum in which she noted that the informants' testimony was "crucial to our case." Indeed, at that point, the

14

state had no other evidence. Mr. Bridges had been excluded as the person who left the bloody palm print on the wall - an exclusion that had been used to rule out approximately 50 other suspects. He did not wear glasses, and he did not smoke Salem Lights. There was no biological evidence that tied him to the crime. As Horner stated in another memo she wrote that same day, this was a "very difficult physical investigation" with "no witnesses and very little physical evidence."

## VIII. The Alleged Hair Match

51. On April 2, 1990, defendant Horner met with the Assistant District Attorney ("ADA"), defendant Whitlock (the CMPD hair examiner) and Jane Burton (the CMPD blood and DNA expert). Upon information and belief, they met to discuss the need to try to develop scientific evidence to successfully prosecute the case against Bridges.

52. That same day, just a week after Bridges' arrest, and before the case was even sent to the grand jury, the ADA sent a letter to the Public Defender's office offering Mr. Bridges a plea to second degree rape or to attempted rape and assault with intent to kill inflicting serious injury on a handicapped person. Mr. Bridges maintained his innocence and refused the proffered plea.

53. On April 9, 1990, a nurse at the Mecklenburg jail took two tubes of blood from Mr. Bridges. The blood was sent to the CMPD lab to be analyzed and compared by Jane Burton to the blood found at the scene.

54. That same day, the CMPD reported the Salem Lights cigarette pack found at the scene had been processed for latent fingerprints, and that none had been found.

15

55.     On April 16, 1990, Timothy Bridges was indicted for First Degree Rape, Breaking and Entering, and Assault with a Deadly Weapon With Intent to Kill Inflicting Serious Injury on a Handicapped Person.

56.     On May 17, 1990, defendant Horner called the ADA. She told the ADA that defendant Whitlock had still not done the hair comparison. The ADA told Horner she would call Whitlock. She also told Horner that if the hairs matched, the defense attorney might plead Mr. Bridges guilty.

57.     On May 30, 1990, defendant Horner again talked to the ADA regarding the hair comparison. She told the ADA that defendant Whitlock still didn't have the hair comparison completed. The ADA then called Whitlock, who reported he had mounted hairs on slides, but had not done a comparison on all of them. Upon information and belief, the ADA indicated to Whitlock that obtaining the results of the hair comparison was important to the case against Mr. Bridges.

58.     On June 25, 1990, defendant Whitlock called defendant Horner and falsely informed her that two of the head hairs recovered from the crime scene belonged to Mr. Bridges. Horner wrote: "Linus! Dictated today: **(2) head hairs - Δ's!!!**" She immediately called the ADA to inform her.

59.     Defendant Whitlock also called the ADA on June 25, 1990. He falsely told the ADA, according to her contemporaneous notes, that a head hair from the bed linen and a head hair from the washcloth in the bathroom **"matched" Bridges**.

60.     The very next day, the ADA informed defendant Horner that she had talked to defendant Whitlock, and that Whitlock had told her **that Bridges' hairs** had been

16

found on the bed linen and on a bloody washcloth. The ADA said that she believed that a guilty plea was now more likely, and that she would talk to Bridges' attorney about that.

61.     On July 3, 1990, defendant Whitlock dictated his laboratory report regarding the hair examination. The report stated that there were two Caucasian head hairs, one from the bed linen and one from a washcloth that were consistent with Timothy Bridges head hairs and falsely stated it was **"likely that these two head hairs originated from Timothy Scott Bridges."**

### IX.     The Palm Print Evidence Excluded Tim Bridges

62.     Besides the fact she was relying on three drug addict informants with prior inconsistent statements and little credibility, defendant Horner realized that her case had another big problem -- the palm print found in blood on the wall of the bedroom in which the rape occurred. Initially, Horner reasonably believed that since Modine Wise had been excluded as the source of the bloody palm print, it belonged to the perpetrator.

63.     The problem Horner had was that Tim Bridges had also been excluded as the source of that palm print. Unless it could be established that someone unrelated to the crime, like a police officer, EMT, or relative, left the bloody palm print, this was powerful exculpatory evidence for Mr. Bridges' defense. Therefore, defendant Horner decided she had to abandon the reasonable assumption that *the perpetrator left the bloody palm print,* and instead adopt a new and completely different theory - *that someone unconnected to the crime had left it,* although the blood at the scene was dry by the time Modine Wise's body was found the next afternoon.

64.     In pursuit of her new theory, defendant Horner went so far as to obtain a court order to exhume the body of Modine Wise's sister-in-law, Virginia Wise, who had found Modine Wise the afternoon after the rape but had since died, in order to have Virginia's palm prints taken.

65.     The exhumation occurred in November 1990. CMPD crime scene experts with years of experience in taking and processing prints took Virginia Wise's palm prints. Both defendant Horner and the ADA were present to make sure the palm prints were taken properly.

66.     Virginia Wise's palm prints were then immediately sent to the CMPD crime lab to be compared by defendant Ramseur to the bloody palm print found at the scene. Ramseur was the supervisor of the CMPD Crime Lab's Latent Print Section. She had twenty-five years of experience in comparing latent prints with known prints to determine whether the comparison was positive or negative.

67.     Prior to receiving Virginia Wise's palm prints, defendant Ramseur had compared the palm prints of approximately 50 suspects to the bloody palm print found at the crime scene. For each, she filed a report stating that the latent print (*i.e.,* the bloody palm print) had been compared to the print of the suspect "with negative results." She testified at the trial that each of the suspects had been *ruled out* as the person who left the bloody palm print at the crime scene.

68.     On November 6, 1990, Ramseur signed a report stating that the comparison between the palm prints of Virginia Wise and the bloody palm print found at the scene was also "negative."

69.    In December 1990, after Virginia Wise had been ruled out as the source of the bloody palm print, defendant Horner sent a memo to the police officers who had responded to the crime scene, noting: "we still cannot identify a bloody palm print found at the scene." She asked them all to go to the Crime Lab to be printed because "[a]s you probably could imagine, *the defense is making a big deal of the unknown print, as it does not belong to the man we have in jail, Timothy Bridges.*"

70.    This effort did not eliminate Horner's problem. On January 8, 1991, Horner called defendant Ramseur to find out the results. Ramseur advised Horner that the comparisons between the palm prints of the police officers and EMTs who had responded to the scene and the bloody palm print were all negative. She testified at the trial that they had all been excluded as the source of the bloody palm print at the scene.

71.    As of January 8, 1991, with the trial of Timothy Bridges set to begin in just two weeks, the source of the problematic bloody palm print, which had not been left by Tim Bridges, had still not been identified.

## X.    Defendant Horner Conceals Exculpatory Evidence

72.    On January 18, 1991, Mr. Bridges' defense counsel filed a "Motion for Exculpatory or Impeachment Material." This motion sought "any materials, facts or evidence in the possession, custody, or control of the State or any law enforcement or other agency which is favorable to the defense, *including but not limited to any evidence pointing to the guilt of [any other] suspects* and any reasons for their being considered suspects." It also asked for any notes or reports that would "tend to refute the state's case." Finally, the motion asked for "any other information which is relevant under Rule

19

404(b) and *State v. Cotton* (1987)." This reference to 404(b) and *State v. Cotton* related to evidence regarding similar crimes committed by someone other than Mr. Bridges, or any other evidence showing third party guilt. This was critical, given the fact that the bloody palm print was still unaccounted for.

73.    Upon information and belief, the ADA told defendant Horner what Mr. Bridges' defense counsel had requested, and/or provided Horner with a copy of the motion.

74.    On January 22, 1991, a jury was empaneled to hear the evidence against Mr. Bridges. Prior to the start of the evidence, the trial court heard argument on Mr. Bridges' Motion for Exculpatory or Impeachment Material.

A.    Horner Conceals Evidence Relating to Ronald Kirkland's Guilt

75.    During the motion hearing held on January 22, the Court specifically asked the ADA if there was any evidence pointing to the guilt of other suspects. The ADA replied, "*I don't have any evidence pointing to the guilt of any other suspects.*" Later in the hearing, the Court again asked the ADA whether she was in possession of any evidence of third party guilt. The ADA responded "nothing that I haven't already given. **The Court ordered, "Well, if you have any evidence of third-party guilt, please produce it. Finally, the Court ordered the ADA to "produce any evidence you have tending to show that . . . the crimes charged and similar offenses were committed by a person not the defendant." The Court then specifically asked the ADA, "Does the State have any evidence from anyone else who says they did it?" The ADA replied, "No, your Honor."**

20

76.     Although Defendant Horner was present during this hearing and knew about the evidence pointing to Kirkland, *including Kirkland's admission to the Modine Wise rape,* she did not provide this information to the ADA or to the Court.

77.     Two days later, on January 24, 1991, defendant Horner wrote a note to the ADA: "Ray [Carlton] and I went through the entire file -- pulled these for your perusal." Upon information and belief, Horner attached various pages from the police file to this note and gave them to the ADA.

78.     Defendant Horner did *not* provide any of the information in the police file regarding Ronald Eugene Kirkland to the District Attorney's office, despite the Court's order that any such material had to be turned over to the defense.

79.     Because defendant Horner concealed from the ADA the information in the police files relating to Ronald Eugene Kirkland, none of that information was ever provided to Mr. Bridges' defense counsel.

B.      <u>Horner Conceals Inconsistent Statements by the State's Key Witnesses</u>

80.     Matt Donaldson was a critical witness for the state at Tim Bridges' trial. Donaldson claimed he was present with Bridges and Clarence Neal Williams, another state witness, when Tim Bridges allegedly admitted to committing the Modine Wise rape. He therefore not only provided incriminating evidence against Bridges; he also corroborated Williams' incriminating testimony.

81.     Vicky Jones was also a critical witness. She too claimed that Tim Bridges had one day, out of the blue, simply volunteered his involvement in the Modine Wise rape.

21

82.     Prior to providing a signed statement to the police on January 22, 1990 claiming that he had heard Tim Bridges admit to the Modine Wise rape to Clarence Neal Williams, Donaldson had told the police on at least three separate occasions that he had never been present when Bridges made any incriminating statement. These inconsistent statements were contained in handwritten notes made by Horner and other officers involved in the investigation. *These handwritten notes were in the police file.* However, they were *not reflected in any official report* written by defendant Horner.

83.     Similarly, *the police filed contained a handwritten note from Investigator Ray Carlton* that indicated Jones was "maintaining she does not know. Claims she has only heard from others. Sounds as if she knows but won't tell." This information was *not contained in any official report* written by defendant Horner.

84.     The defense "Motion for Exculpatory or Impeachment Material" asked for any notes or reports that would "tend to refute the state's case." It had also specifically asked for any statements made by a witness or the state "which are inconsistent with or at variance with what the witness is expected to testify to at trial."

85.     Although defendant Horner was present during the hearing on defendant's Motion for Exculpatory or Impeachment Evidence, and although she specifically went through her file with Investigator Carlton two days after that hearing, *defendant Horner did not provide to the District Attorney the handwritten notes containing Donaldson's and Jones' inconsistent statements.*

22

86. Because Horner concealed the notes relating to the inconsistent statements made by Donaldson and Jones from the District Attorney's office, the defense was deprived of this information when cross-examining Donaldson and Jones.

C.   Horner Conceals Evidence of Incentives Offered to Witnesses

87. Defendant Horner also concealed evidence that investigators working on the Modine Wise case offered incentives to witnesses to implicate Timothy Bridges. This evidence included, but was not limited to, the following:

> a.   Notes by Investigator Ray Carlton that stated Carlton had told Eddie Moss, an associate of Tim Bridges, "I would get him money if he could get me something we could work with" implicating Tim Bridges.

> b.   Notes by defendant Horner that she had told Carlton to stop Eddie Moss and Matt Donaldson for soliciting for prostitution and threaten to lock them up because this "will give us some leeway [*i.e.,* leverage] with them. . . 'You talk to us about Tim and we won't charge you with loitering.'"

88. Horner concealed these notes from the District Attorney's office, despite the Court's order to turn over any evidence that might impeach the state's witnesses.

89. Because Horner concealed these notes from the District Attorney's office, the defense was deprived of this information when cross-examining Carlton and Horner, who both testified for the state at Mr. Bridges' trial, and from impeaching the conduct of the investigation conducted by the CMPD.

## XI.   Defendant Ramseur Falsifies Her Palm Print Results

90. On January 15, 1991, just a week before the trial was to begin, defense counsel and the ADA met at the Law Enforcement Center to review the physical

23

evidence. Defendant Ramseur was present for at least part of that meeting, and the bloody palm print left at the scene was discussed. At that meeting, the ADA told Ramseur that she "wished" the bloody palm print had belonged to Virginia Wise.

91. Upon information and belief, based upon this comment by the ADA, Ramseur decided to falsify the results of her Virginia Wise palm print comparison. Despite her report of November 6, 1990, which found that the comparison of Virginia Wise's palm prints to the bloody palm print found at the scene was "negative," Ramseur told the District Attorney sometime between January 15 and January 23, 1991, that she could not determine whether the bloody palm print was Virginia Wise's. Ramseur falsely claimed the impressions of Wise's palm prints did not have sufficient detail to compare to the bloody palm print left at the scene. This was a fabrication.

92. Although Ramseur knew in November 1990 that Virginia Wise's body was being exhumed specifically to obtain palm prints to compare to the bloody palm print left at the scene, and actually examined Virginia Wise's palm prints only a few days after the exhumation, she did not tell Horner or the evidence technicians who had taken the palm prints that the prints were not sufficient to make a comparison to the palm print found at the scene. Nor did she ever tell anyone else this before making this false claim to the ADA.

93. During closing argument, the State relied on Ramseur's fabrication to argue that it was Virginia Wise who had left the bloody palm print.

## XII. Defendant Whitlock Fabricates "Scientific" Evidence

94. Given the weakness of the informant testimony and the still unidentified bloody palm print, defendant Whitlock knew that linking Bridges' hair to the crime scene was critically important to the case against Tim Bridges.

95. Before the trial, defendant Whitlock met with the ADA and CMPD blood analyst Jane Burton. During this meeting, Whitlock learned that Burton had not been able to link any of the blood found at the scene to Mr. Bridges. This meant that the purported hair match would be the only physical evidence that could link Mr. Bridges to the crime.

### A. Whitlock's False and Misleading Statements

96. Whitlock therefore provided false and misleading information to the prosecutor about his hair analysis and the strength of evidence that resulted from his analysis.

97. Whitlock told the Assistant District Attorney that out of the hundreds of Caucasian head hairs that had been recovered at the scene, he had found two that were not consistent with the head hair of Modine Wise. He further claimed that these two hairs belonged to Mr. Bridges.

98. Defendant Whitlock went far beyond what he knew or reasonably should have known was scientifically justified in describing the significance and strength of his analysis. Whitlock's false and misleading statements included, but were not limited to, the following:

a.     Whitlock falsely claimed that although no one characteristic of Mr. Bridges' hair was rare, the fact that all of the characteristics of the questioned hair were allegedly found in the specimen taken from Mr. Bridges **made for a strong identification.** This was false and misleading. There existed no scientifically accepted statistics about the frequency with which particular characteristics of hair are distributed in the population.

b.     Whitlock falsely claimed that there was **approximately a one in a thousand** chance that one would find two people from the general population with Caucasian head hairs whose hair would contain the same microscopic characteristics. In short, **he claimed that the odds were at least 1000 to 1 that the two head hairs found at the scene belonged to Mr. Bridges.** This was false and misleading. There were (and are) no scientific studies to support this claim.

c.     Whitlock bolstered his false and misleading opinions by telling the prosecutor he had studied approximately 2,000 to 3,000 hairs in his career, and falsely stating **there was only one time when he could not tell two hairs apart, in a case involving Negroid pubic hairs.** There was no scientific basis for this statement, as there was no independent evidence that Whitlock had in fact correctly identified all the other hairs he had studied.

d.     Whitlock told the prosecutor he had examined 500 to 800 Caucasian head hairs in his career, and falsely **claimed he had never been unable to distinguish between two Caucasian head hairs.** There was no scientific basis for this claim, as there was no independent evidence that Whitlock had in fact correctly "matched" the hairs in these other 500-800 cases.

e.     Whitlock falsely claimed that if two head hairs were consistent in their macroscopic and microscopic characteristics, then it was **"likely"** that the hairs originated from the same source, and that it was **likely** that the hairs collected at the crime scene **originated from Tim Bridges.** There was (and is) no scientific basis for this claim.

99.     Finally, Whitlock claimed that the hairs which "likely" belonged to Tim Bridges (at odds of 1000 to 1) had microscopic pieces of blood on them, which would have been deposited at the time Ms. Wise was attacked. Thus, Whitlock's fabrications tied Tim Bridges directly to the assault and rape of Modine Wise.

26

### XIII. The Suppression of Exculpatory Evidence by Defendant Horner and the Fabrications of Ramseur and Whitlock Resulted in Tim Bridge's Conviction

100.   During her closing arguments, the Assistant District Attorney conceded that the informants who testified for the state had limited credibility:

> "[the defense attorney] has talked about the credibility of the witnesses in this case, the three people that the State called to the stand, and, boy, I wish we could pick and choose our witnesses because I would have picked and chosen some better than those folks, but we don't get to pick them."

Had the impeachment evidence regarding these witnesses been disclosed to the District Attorney's office and thus to the defense, their already shaky credibility would have been completely destroyed.

101.   Because the informants were such weak witnesses even in the absence of the impeachment evidence concealed by Horner, the prosecutor relied heavily on the fabrications of defendant Whitlock in arguing for the conviction of Tim Bridges.

> "... as Mr. Whitlock testified, it would be a one in a thousand chance of two people at random in the population having the same hair characteristics.
>
> And there wasn't just one hair there, there was two hairs. Now, there was a lot of hair. And I guess if Mr. Whitlock, had, you know, continued working on this case for another year or two, maybe he could have found some more of the defendant's hair there, but you have to reach a point of diminishing return somewhere.
>
> And Mr. Whitlock was qualified by the judge as an expert in this field of hair, and he said that it was likely to have come from the defendant."

102.   The defense's primary argument in closing was that Tim Bridges was not guilty because he had been excluded as the source of the bloody palm print found at the crime scene.

27

"And I'll argue to you, members of the jury, the palm print that was left there was left there by the perpetrator. . . . It was left there by the perpetrator. . . . They have a problem. They can't tell you who the palm print belonged to, and you know from the number of times that palm print was analyzed, its important to this case. Not one, not two, not three, but 63 times. 63 times. That tells you it's important."

103.    To rebut this defense argument, the prosecutor relied on the fabrication of defendant Ramseur to argue that the bloody palm print was irrelevant to the guilt or innocence of Tim Bridges because Virginia Wise was the source of this print.

"Now, the print on the wall is a problem, and there's no denying that. And I said that in my opening statement. . . . And we wanted to find that out badly enough that we had the poor woman [Virginia Wise] dug up and her palm prints taken after she had been in the ground for four months. And that was an expense that we were willing . . . to bear, to try to find out if that was her print. And as Ms. Ramseur said on the stand, that there wasn't enough of a print, palm print there to compare. So I submit that it's still possible that it's Virginia's print. . . . I submit that it's Virginia Wise's print, but we just can't prove that."

104.    The prosecutor also stressed in her closing argument that Tim Bridges was guilty because the police had conducted a thorough investigation, and had ruled out sixty-three other suspects. Because defendant Horner had hidden from the District Attorney the evidence relating to the guilt of Ronald Kirkland, including his admission that he had committed the Modine Wise rape, defense counsel was not provided with this information, and was not able to impeach the CMPD investigation or rebut the argument of the prosecutor that the police had considered and ruled out every other suspect.

105.    As a result of the fabrications of defendants Whitlock and Ramseur, defendant Horner's concealment of the exculpatory evidence pointing to the guilt of Ronald Kirkland, and her further concealment of the impeachment evidence relating to

28

the manner in which the CMPD incentivized the informants to make statements against Mr. Bridges and the multiple inconsistent statements these informants made, Timothy Bridges was deprived of his constitutional right to a fair criminal proceeding.

106.    On February 1, 1991, the jury convicted Mr. Bridges of the rape of Modine Wise.  He was sentenced to life in prison.  It was not until he had served twenty-five years of this sentence that DNA evidence established that Tim Bridges was innocent. Horner, Whitlock and Ramseur's intentional misconduct caused this horrendous miscarriage of justice.

### XIV.  The CMPD Had A Policy and/or Practice of Concealing Exculpatory Evidence from the Mecklenburg County DA's Office

107.    Defendant   Horner's   misconduct   in   concealing   exculpatory   and impeachment evidence was the result of a conscious and intentional policy and/or practice adopted by the CMPD to conceal exculpatory evidence from the District Attorney, and thereby keep it hidden from defense counsel.

108.    In order to thwart the efforts of the District Attorney to comply with its constitutional obligation to provide all *Brady* and *Giglio* material to defendants prior to trial, the CMPD adopted a policy and practice of not providing such evidence to the District Attorney's office.  Upon information and belief, the rationale for this policy and practice was that if the exculpatory and impeachment evidence was not in the physical possession of the District Attorney's office, it would not be provided to the defense.

29

109. The policy and practice of the CMPD to conceal *Brady* and *Giglio* material from the Mecklenburg County District Attorney's office continued for at least a decade, and until at least 1995.

110. There were a number of cases in addition to this case in which the CMPD concealed *Brady* and *Giglio* material from the Mecklenburg County District Attorney's office prior to 1995. One such case was the prosecution of Dr. Edward Friedland for the murder of his wife, Kim Thomas, in 1990.

111. During a four-year investigation from 1990 until 1994, which overlapped the investigation of the Modine Wise rape and the prosecution of Tim Bridges, the CMPD gathered and documented substantial evidence pointing to the guilt of an alternative suspect, Marion Gales, a handyman who had worked at the Friedland house just days before the murder. All of this evidence was concealed from the District Attorney's office. As a result, Dr. Friedland was indicted for the murder in 1994.

112. In March 1995, as a result of motions filed by Dr. Friedland's defense counsel, subpoenas *duces tecum* issued to the investigators who had worked on the case, and an evidentiary hearing ordered by the presiding Superior Court Judge, the CMPD reports pointing to the guilt of Marion Gales were produced by the CMPD to the Court *in camera*. The Court, after determining these materials were exculpatory, ordered that the reports be given to the District Attorney's office.

113. After being provided with the exculpatory CMPD reports pointing to the guilt of Marion Gales, the District Attorney's office voluntarily dismissed all charges against Dr. Friedland. Marion Gales was subsequently found responsible for the death of

Kim Thomas in a civil wrongful death proceeding, and was later convicted of homicide in yet another case.

114. Upon information and belief, the CMPD concealed exculpatory evidence from the District Attorney's office in other cases.

**XV.  Timothy Bridges Continues to Assert His Innocence**

115. Timothy Bridges appealed his conviction to the North Carolina Court of Appeals. Although the Court held there was an insufficient foundation laid for the admission of Whitlock's testimony regarding the statistical probability of the hair belonging to someone other than Timothy Bridges, it found this error to be harmless. The Court also found there was a factual basis in the record, based upon Ramseur's trial testimony, for the prosecutor to argue that the bloody palm print belonged to Virginia Wise, and not to the actual perpetrator. Judge Greene dissented, arguing that the admission of the statistical probability evidence was not harmless in light of the palm print evidence that indicated someone other than Bridges was the assailant. The North Carolina Supreme Court affirmed the decision of the Court of Appeals.

116. After his conviction was affirmed, Mr. Bridges continued to assert his innocence. For example, he refused to enter into the Sexual Offender Accountability and Responsibility program ("SOAR") of the North Carolina Department of Corrections because it required him to admit his guilt -- even though admission to this program would result in an earlier parole from his sentence.

117. Between 1992 and 2007, Mr. Bridges unsuccessfully sought legal assistance to establish his innocence on a number of occasions. For example, prior to

1998, Mr. Bridges wrote to North Carolina Prisoner Legal Services ("NCPLS") asserting his innocence, and seeking their help to free him from prison. NCPLS conducted an investigation, and in November 2000 informed Mr. Bridges that it could not help him.

118. In October 2007, after hearing about the exoneration of Dwayne Dail for a rape he had not committed, Mr. Bridges wrote to the North Carolina Center On Actual Innocence ("NCCAI"), requesting its help in establishing his innocence.

119. After investigating his case, the NCCAI sent a request to the CMPD to determine if there was any physical evidence that could be tested for DNA. The NCCAI was told that the only physical evidence that remained was a blood standard. As a result, the NCCAI informed Mr. Bridges in March 2010 that it was unable to provide him with assistance in his claim of innocence.

120. In August 2010, Mr. Bridges wrote to NCPLS again asserting his innocence, and asking for its help. NCPLS agreed to re-open its file.

121. In November 2012, the FBI admitted that in a number of cases, its hair analysts had testified in ways that "exceeded the limits of science."

122. After learning of this development, NCPLS began to investigate whether defendant Whitlock's testimony had also exceeded the limits of science.

123. In October 2014, NCPLS filed a Motion for Appropriate Relief, asserting that defendant Whitlock's testimony had exceeded the limits of science and was false and misleading, and thereby violated Mr. Bridges right to due process of law. NCPLS also filed a Motion for Location and Preservation of Evidence, and a Motion for Post-Conviction DNA Testing.

32

124. On October 1, 2015, the Mecklenburg County District Attorney's office consented to Mr. Bridges' Motion for Appropriate Relief. In a Consent Order, Superior Court Judge Lisa Bell found that Whitlock's testimony "was the centerpiece of the State's case," and further found that his testimony violated Mr. Bridges' right to due process "because it exceeded the limits of the science and overstated the significance of the hair analysis to the jury." The Court concluded that Mr. Bridges' conviction was obtained in violation of the due process clause of the Fourteenth Amendment to the Constitution of the United States, vacated the conviction, and ordered a new trial. Mr. Bridges was released on an unsecured bond of $10,000.

## XVI. Timothy Bridges is Exonerated by DNA Testing

125. On September 28, 2015, the Mecklenburg County Clerk's office discovered that, contrary to the information provided by the CMPD to the NCCAI in 2010, some of the physical evidence from the 1991 trial, including items found on the victim's bed, had been preserved. Among these items was a men's coat.

126. On October 1, 2015, acting pursuant to Mr. Bridges' motion for DNA testing, Superior Court Judge Lisa Bell entered an order requiring that the CMPD preserve these items, and further requiring that the CMPD Crime Lab conduct expedited DNA testing on any of these items that was suitable for such testing.

127. On October 5, 2015, the CMPD Crime Laboratory issued a report regarding the DNA Analysis it had performed. The findings were as follows:

   a. Semen was detected on the exterior right arm of the men's coat. **Timothy Bridges was excluded as a possible contributor.**

b.   Male DNA was found in a stain on the interior lining of the coat. **Timothy Bridges was excluded as a possible contributor.**

c.   Male DNA was found in a stain on the exterior right arm of the coat near the elbow.   **Timothy Bridges was excluded as a possible contributor.**

d.   A partial male DNA profile was obtained from a cigarette butt found in the pocket of the coat.  It was consistent with the male DNA profile obtained from the semen stain.  **Timothy Bridges was excluded as a possible contributor.**

128.   On February 16, 2016, the Mecklenburg County District Attorney dismissed all charges against Mr. Bridges with prejudice.

**XVII.   Timothy Bridges Suffered Grievous Damages**

129.   As a result of the misconduct of defendants Horner, Whitlock, Ramseur and Snider, Tim Bridges lost the twenty-five most important years of his life.  He went into prison in 1991 as a young man of twenty-three, and emerged in 2015 as a middle-aged man of forty-eight.

130.   When he entered Central Prison as a scared 23-year old, older inmates attempted to sexually assault him on multiple occasions.  He heard other prisoners being raped.  He saw other inmates being stabbed.  Others openly engaged in gay sex.  He found himself in the middle of a prison riot between black and Indian inmates.   His personal possessions were stolen.   He suffered physical injuries, and had to be hospitalized. There were rats and insects in the cells and the kitchens. The guards engaged in arbitrary and degrading behavior towards him and other prisoners.  He was told when to eat, when to sleep, when to wake up, when to shower, and when to use the telephone.  Every minute of every day he was subjected to the control of others. There

34

was never any quiet; he always felt he had to be "on guard." During all this, he knew he was innocent.

131. When he emerged from prison, the world he knew had completely changed. Both his parents had died, both his grandmothers had died, and his aunt and uncle had died. He had no close family left, no friends, and no resources. He was virtually alone in the world, left to fend for himself with no job and bleak job prospects. As a result of what he was subjected to for twenty-five years, Mr. Bridges still cannot sleep in the dark, and wakes after about four hours. He likely suffers from PTSD.

132. These and additional damages caused by the misconduct of defendants Horner, Whitlock, Ramseur, Snider and the City of Charlotte will be proven at the trial of this matter.

## CAUSES OF ACTION

## STATE COMMON LAW CLAIMS

## COUNT I

## WRONGFUL IMPRISONMENT AND CIVIL CONSPIRACY

(Against Horner, Whitlock, Ramseur and Snider in their individual capacities)

133. Plaintiff hereby incorporates the allegations made in the foregoing paragraphs, and further alleges as follows:

134. Defendants Horner's, Whitlock's, Ramseur's and Snider's governmental immunity has been waived by Mecklenburg County's purchase and maintenance of insurance for Defendants' conduct.

135. Defendants' conduct, as set forth above, was reckless and malicious, and public officer immunity therefore does not apply to their conduct.

136. Defendants Horner, Whitlock, Ramseur and Snider, acting individually and in concert with each other, and under color of state law, engaged in wrongful acts and omissions that resulted in the unlawful conviction of Timothy Bridges on February 1, 1991.

137. Defendants Horner, Whitlock, Ramseur and Snider conspired and agreed with one another to deprive Timothy Bridges of his right to a fair trial, and engaged in one or more overt acts in furtherance of that agreement.

138. Timothy Bridges' unlawful conviction, which was caused by defendants' wrongful acts and omissions, resulted in the illegal and unlawful restraint and imprisonment of Timothy Bridges for twenty-five years, from the date of his conviction on February 1, 1991 until the date of his release on October 1, 2015.

139. The illegal and unlawful restraint and imprisonment of Timothy Bridges was by force and against his will,

140. The wrongful acts and omissions of defendants were deliberate and/or intentional.

141. The illegal restraint and imprisonment of Timothy Bridges finally ended on October 1, 2015.

142. Defendants knew or reasonably should have known that their intentional acts and omissions would result in Timothy Bridges' conviction and resulting imprisonment for a crime he did not commit.

143. Any reasonable law enforcement officer in 1991 would have known – and defendants did know – that that their wrongful acts and omissions was highly likely to result in Timothy Bridges' conviction and would deprive him of a fair trial. No reasonable officer would have believed this conduct was lawful.

144. As a direct and foreseeable consequence of defendants' intentional acts and omissions, Timothy Bridges served twenty-five years in the prisons of North Carolina for a crime he did not commit.

145. As a direct and foreseeable consequence of defendants' intentional conduct, Timothy Bridges has suffered personal physical injury, physical sickness, emotional trauma, loss of consortium and loss of liberty, as well as other damages to be determined at the trial of this matter.

**COUNT II**

**IMPEDING AND HINDERING PUBLIC AND LEGAL JUSTICE
AND CIVIL CONSPIRACY**

(Against Horner, Whitlock, Ramseur and Snider in their individual capacities)

146. Plaintiff hereby incorporates the allegations made in the foregoing paragraphs, and further alleges as follows:

147. Defendants' governmental immunity has been waived by Mecklenburg County's purchase and maintenance of insurance for Defendants' conduct.

148. Defendants' conduct, as set forth above, was reckless and malicious, and public officer immunity therefore does not apply to their conduct.

37

149.   Defendants concealed their wrongful conduct from Timothy Bridges, and concealed their responsibility for the injury and damage they caused to Timothy Bridges, and thereby prevented him from learning of it until 2015.

150.   Defendants had knowledge of the real facts and intended that Timothy Bridges not learn of their misconduct.

151.   Timothy Bridges did not know, and had no reasonable means to discover, the real facts, and therefore relied upon the conduct of the defendants to his detriment.

152.   Until 2015, Timothy Bridges did not discover, and could not with the exercise of due diligence reasonably have discovered, the real facts supporting this claim, or the responsibility of defendants for the injury and damage they caused him beginning on February 1, 1991.

153.   Beginning in 1990 and continuing through February 1, 1991, defendants Horner, Whitlock, Ramseur and Snider, acting individually and in concert with each other, and under color of state law, engaged in acts that attempted to and did prevent, obstruct, impede, and hinder public and legal justice in the State of North Carolina.

154.   Defendants Horner, Whitlock, Ramseur and Snider conspired and agreed with one another to impede and hinder public and legal justice, and engaged in one or more overt acts in furtherance of that agreement

155.   Beginning in 1990 and continuing through February 1, 1991, defendants Horner and Snider intentionally and maliciously concealed exculpatory and impeachment evidence from the District Attorney's office so that this evidence would not be provided to Timothy Bridges or his defense counsel.

38

156. Beginning in 1990 and continuing through February 1, 1991, defendant Whitlock intentionally fabricated evidence related to his qualifications, to the reliability of hair comparison evidence, and to the alleged "match" of two hairs found at the scene of the Modine Wise rape to Timothy Bridges, among other things.

157. In January 1991, defendant Ramseur intentionally fabricated evidence related to the comparison of a bloody palm print found at the scene of the crime to the palm prints of Virginia Wise by claiming that Virginia Wise could not be excluded as the source of that print, when in fact Ramseur had excluded her.

158. The defendants' wrongful conduct caused Timothy Bridges to be wrongfully convicted of the rape of Modine Wise, a crime he did not commit.

159. Defendants knew or reasonably should have known that their intentional acts and omissions would result in Timothy Bridges' conviction for a crime he did not commit.

160. Any reasonable law enforcement officer in 1991 would have known -- and defendants did know -- that their wrongful acts and omissions were highly likely to impede and hinder public and legal justice, and result in Timothy Bridges' conviction and imprisonment. No reasonable officer would have believed this conduct was lawful.

161. Defendants' intentional acts and omissions hindered and impeded public and legal justice in North Carolina by causing Timothy Bridges' conviction and imprisonment for a crime he did not commit.

162. As a direct and foreseeable consequence of defendants' intentional conduct, Timothy Bridges was convicted and served twenty-five years in the prisons of North Carolina for a crime he did not commit.

163. As a direct and foreseeable consequence of defendants' intentional conduct, Timothy Bridges has suffered personal physical injury, physical sickness, emotional trauma, loss of consortium and loss of liberty, as well as other damages to be determined at the trial of this matter.

### STATE CONSTITUTIONAL CLAIM (Alleged in the Alternative)

### COUNT III

### DUE PROCESS VIOLATIONS UNDER ARTICLE I, SECTIONS 19 AND 20 OF THE NORTH CAROLINA CONSTITUTION AND CIVIL CONSPIRACY

*(Against the City of Charlotte and Horner,*
*Whitlock and Ramseur in their official capacities)*

164. Plaintiff hereby incorporates the allegations made in the foregoing paragraphs.

165. In the event that the Court finds that Plaintiff's state tort remedies are inadequate as a matter of law, Plaintiff further alleges as follows:

166. Acting individually and in concert under color of state law, defendants deprived Timothy Bridges of his rights to due process of law and a fair trial under Sections 19 and 20 of the North Carolina Constitution by intentionally and/or recklessly fabricating false inculpatory evidence and concealing exculpatory and impeachment evidence.

40

167. Defendants Horner, Whitlock, Ramseur and Snider conspired and agreed with one another to deprive Timothy Bridges of his right to due process of law and a fair trial, and engaged in one or more overt acts in furtherance of that agreement.

A.   Fabrication of Hair Comparison Evidence

168. Specifically, Defendant Whitlock intentionally and/or recklessly fabricated evidence that there was a match between Tim Bridges' hair and two hairs covered with blood found at the scene, and that the odds of anyone other than Tim Bridges being the source of the hair were 1000 to 1.

169. Whitlock intentionally and/or recklessly fabricated evidence that all of the characteristics of the questioned hair were allegedly found in the specimen taken from Mr. Bridges, and therefore made for a strong identification.

170. Whitlock intentionally and/or recklessly fabricated evidence about his own qualifications by claiming that out of the approximately 2,000 to 3,000 hairs he had studied in his career, there was only one time when he had been unable to tell two hairs apart.

171. Whitlock intentionally and/or recklessly fabricated evidence about his own qualifications by claiming that out of the 500 to 800 Caucasian head hairs he had examined in his career, he had never been unable to distinguish between two Caucasian head hairs.

172. Whitlock intentionally and/or recklessly fabricated evidence that if two head hairs were consistent in their macroscopic and microscopic characteristics, then it was "likely" that the hairs originated from the same source, and that it was likely that the

41

hairs collected at the crime scene originated from Tim Bridges.

B.     <u>Fabrication of Palm Print Evidence</u>

173.     Defendant Ramseur intentionally and/or recklessly fabricated evidence by claiming that the palm prints taken from Virginia Wise lacked sufficient detail to be able to determine whether the bloody palm print found at the crime scene belonged to Virginia Wise, when in fact she had excluded Virginia Wise as the source of the bloody palm print.

174.     Defendant Ramseur intentionally and/or recklessly fabricated evidence by claiming that the comparison of the palm prints of Virginia Wise with the bloody palm print found at the house was inconclusive, when in fact Virginia Wise was excluded as the source of the bloody palm print.

175.     Any reasonable law enforcement officer in 1991 would have known – and defendants Whitlock and Ramseur did know – that the fabrication and falsification of material evidence was highly likely to result in Timothy Bridges' conviction and would deprive him of a fair trial. No reasonable officer would have believed this conduct was lawful.

176.     Defendants' fabrications were used at Timothy Bridges' trial.

177.     Defendants' fabrications directly and proximately caused Timothy Bridges' wrongful conviction and deprivation of liberty without due process of law, as well as the other injuries and damages set forth in this complaint.

42

C.    Concealment of Exculpatory Evidence in Violation of Court Order

178.    Defendant Horner violated an order of the Superior Court judge presiding at Tim Bridges' trial by intentionally and/or recklessly concealing from the District Attorney's office that Ronald Eugene Kirkland (a) matched the description of the Wise perpetrator, (b) had been identified by a Gaston County investigator as a suspect in the Wise rape shortly after that rape, (c) had been working in Charlotte in May 1989, (d) had blood on his clothes when his room was searched by police in May 1989, (e) was facing multiple charges in Gaston County for raping elderly women during May 1989, and (f) had admitted to the assault and rape of Modine Wise.

179.    Any reasonable law enforcement officer in 1991 would have known – and defendant Horner did know – that ignoring a specific court order that evidence pointing to the guilt of another suspect be provided and concealing evidence that another person committed the crime for which defendant was standing trial, was highly likely to result in depriving Timothy Bridges of a fair trial.  No reasonable officer would have believed this conduct was lawful.

D.    Concealment of Impeachment Evidence in Violation of Court Order

180.    Defendant Horner violated a specific order of the Superior Court judge presiding at Tim Bridges' trial by intentionally and/or recklessly concealing from the District Attorney's office that the State's key witnesses had made statements that were inconsistent with their trial testimony.

181.    Specifically, defendant Horner concealed from the District Attorney's office that prior to witness Matt Donaldson providing a signed statement to the police on

43

January 22, 1990 in which he claimed he had been physically present when Tim Bridges allegedly admitted to the Modine Wise rape, Donaldson had told the police on at least three separate occasions that he had never been present when Bridges made any incriminating statement.

182. Defendant Horner also concealed from the District Attorney's Office that witness Vicky Jones had told an investigator that she did not know if Tim Bridges had ever admitted to the Modine Wise rape. This statement by Jones was inconsistent with her trial testimony, in which she claimed she heard Tim Bridges' spontaneously admit to this crime.

183. Defendant Horner also concealed from the District Attorney's office that that she had told her partner, Ray Carlton, to threaten to lock Matt Donaldson up for loitering for purposes of prostitution and to tell him "you talk to us about Tim and we won't charge you with loitering," and that Investigator Carlton had offered money to at least one potential witness in return for information implicating Tim Bridges in the rape of Modine Wise.

184. Any reasonable law enforcement officer in 1991 would have known – and defendant Horner did know – that concealing evidence that (a) two of the key state's witnesses had made statements inconsistent with their trial testimony on a material fact, and (b) investigators had provided incentives to witnesses in return for statements that incriminated the defendant on trial, was highly likely to result in Timothy Bridges being deprived of a fair trial. No reasonable officer would have believed this conduct was lawful.

185.    Defendant Horner deprived Timothy Bridges of his liberty without due process of law, and of his right to a fair trial, by deliberately and/or recklessly concealing exculpatory and impeachment evidence.

186.    Defendant Horner's deliberate, intentional and/or reckless concealment of exculpatory and impeachment evidence directly and proximately caused Timothy Bridges' wrongful conviction and deprivation of liberty without due process of law during his 25-year imprisonment, as well as the other injuries and damages set forth in this complaint.

187.    Defendants' actions evidenced a reckless and callous disregard for, and deliberate indifference to, Timothy Bridges' state constitutional rights.

188.    As a foreseeable result of defendants' conduct, Timothy Bridges was held in custody for twenty-five years, and was thereby deprived of his due process rights as guaranteed by Article I, Sections 19 and 20 of the North Carolina Constitution.

189.    As a direct and foreseeable consequence of this deprivation, Timothy Bridges has suffered personal physical injury, physical sickness, emotional trauma, loss of consortium and loss of liberty in each year from January 1991 until October 2015, as well as other damages to be determined at the trial of this matter.

## COUNT IV

## DUE PROCESS VIOLATION UNDER ARTICLE I, SECTIONS 19 AND 20 OF THE NORTH CAROLINA CONSTITUTION

**Failing to Establish a Constitutionally Adequate Regime of Training, Supervision and Discipline Regarding the Production of Exculpatory Information to Prosecutors**

*(Against the City of Charlotte and defendant Snider in his official capacity)*

45

190.    Plaintiff hereby incorporates all of the foregoing paragraphs.

191.    In the event that the Court finds that Plaintiff's state tort remedies are inadequate as a matter of law, Plaintiff further alleges as follows:

192.    Defendant Larry Snider, as the Captain in charge of the Felony Investigations Bureau, had the authority and responsibility to train, supervise and discipline investigators in the Felony Investigations Bureau of the Charlotte Police Department, including defendant Cheryl Horner.

193.    Defendant Snider failed to adequately train, supervise and discipline the investigators in the Charlotte Police Department, including defendant Horner, with regard to the necessity of fully and completely disclosing all exculpatory and impeachment material to prosecutors.

194.    Defendant Snider failed to ensure that Charlotte Police Department investigators, including defendant Horner, disclosed all exculpatory and impeachment evidence discovered during their investigation to the District Attorney so that such information would be disclosed to defense counsel, including but not limited to counsel for Timothy Bridges, as required by law.

195.    Defendant Snider's failure to discipline Charlotte Police Department investigators, including defendant Horner, for failing to provide all exculpatory and impeachment evidence to the District Attorney's office amounted to gross indifference and/or intentional misconduct and directly caused the violations of Timothy Bridges' constitutional rights and his wrongful twenty-five year imprisonment.

196.    Defendant Snider was deliberately and recklessly indifferent to criminal defendants', including Timothy Bridges', clearly established rights under the Fourteenth Amendment of the United States Constitution to due process of law and a fair trial.

197.    As a direct and proximate result of the above-described wrongful conduct of defendant Snider, Timothy Bridges suffered physical injury, emotional trauma and loss of liberty in each year from 1991 through 2015.

## PUNITIVE DAMAGES

198.    Plaintiff hereby incorporates all of the foregoing paragraphs and further alleges as follows:

199.    The acts of defendants Horner, Whitlock, Ramseur and Snider alleged above were willful, wanton and intentional and evinced a reckless disregard for and indifference to the rights and safety of the public, including Timothy Bridges, who as a result spent twenty-five years in prison for a crime he did not commit.

200.    The acts alleged above proximately caused the injuries suffered by Timothy Bridges, and he is therefore entitled to recover punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Timothy Bridges respectfully requests that the Court enter judgment in his favor and against defendants on all counts of the complaint, and award relief as follows:

1.    Compensatory damages against the defendants, jointly and severally, in an amount to be determined at trial;

47

2.    Punitive damages against all defendants in their individual capacities, jointly and severally, in an amount to be determined at trial, in order that such award will deter similar prohibited behavior by defendants and other officials and law enforcement officers in the future;

3.    Pre-judgment and post-judgment interest and recovery of his costs, including reasonable attorneys' fees, against all defendants, jointly and severally; and

4.    Any and all other relief to which he may be entitled.

Respectfully submitted this the 9th day of May, 2016.

RUDOLF WIDENHOUSE

David S. Rudolf, NCSB # 8587
Sonya Pfeiffer, NCSB # 37300
225 East Worthington Avenue
Suite 200
Charlotte, NC 28203
Telephone:    (704) 333-9945
Telefax:        (704) 335-0224
Email:    dsrudolf@rudolfwidenhouse.com
            spfeiffer@rudolfwidenhouse.com

**ATTORNEYS FOR PLAINTIFF**

48

# STATE OF NORTH CAROLINA

___Mecklenburg___ County

File No.

16CVS8609

In The General Court Of Justice
☐ District ☒ Superior Court Division

Name Of Plaintiff
Timothy Scott Bridges

Address
c/o David S. Rudolf, 225 E. Worthington Ave.

City, State, Zip
Charlotte, NC 28203

**VERSUS**

Name Of Defendant(s)
City of Charlotte, Larry Snider, Cheryl Horner, Elinos Whitlock, and Kathleen Ramseur ✚

# CIVIL SUMMONS

☐ ALIAS AND PLURIES SUMMONS (ASSESS FEE)

G.S. 1A-1, Rules 3, 4

Date Original Summons Issued

Date(s) Subsequent Summons(es) Issued

## To Each Of The Defendant(s) Named Below:

Name And Address Of Defendant 1
City of Charlotte
Jennifer Roberts, Office of the Mayor
600 East Fourth Street, 15th Floor
Charlotte, NC 28202

Name And Address Of Defendant 2

## A Civil Action Has Been Commenced Against You!

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

Name And Address Of Plaintiff's Attorney (If None, Address Of Plaintiff)
David S. Rudolf and Sonya Pfeiffer
225 E. Worthington St., Ste. 200
Charlotte, NC 28203

Date Issued
5/10/16

Time
2:08   ☐ AM  ☒ PM

Signature

☐ Deputy CSC  ☐ Assistant CSC  ☒ Clerk Of Superior Court

☐ ENDORSEMENT (ASSESS FEE)
This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days.

Date Of Endorsement

Time   ☐ AM  ☐ PM

Signature

☐ Deputy CSC  ☐ Assistant CSC  ☐ Clerk Of Superior Court

NOTE TO PARTIES: *Many counties have MANDATORY ARBITRATION programs in which most cases where the amount in controversy is $15,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

AOC-CV-100, Rev. 6/11
© 2011 Administrative Office of the Courts

(Over)

## RETURN OF SERVICE

I certify that this Summons and a copy of the complaint were received and served as follows:

### DEFENDANT 1

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason.

| Service Fee Paid | Signature Of Deputy Sheriff Making Return |
|---|---|
| $ | |
| Date Received | Name Of Sheriff (Type Or Print) |
| Date Of Return | County Of Sheriff |

AOC-CV-100, Side Two, Rev. 6/11
© 2011 Administrative Office of the Courts

NORTH CAROLINA       IN THE GENERAL COURT OF JUSTICE
MECKLENBURG COUNTY       SUPERIOR COURT DIVISION
                       CASE NO.: 2016-CVS-8609

|  |  |  |
|---|---|---|
| TIMOTHY SCOTT BRIDGES | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CITY OF CHARLOTTE, LARRY SNIDER, in | ) | ACCEPTANCE OF SERVICE |
| his individual and official capacities and in his | ) | |
| supervisory capacity as the Capt. in charge of | ) | |
| the Felony Investigations Bureau of the | ) | |
| Charlotte Police Department, CHERYL | ) | |
| HORNER, in her individual and official | ) | |
| capacities, ELINOS WHITLOCK, in his | ) | |
| individual and official capacities, and | ) | |
| KATHLEEN RAMSEUR, in her individual and | ) | |
| official capacities, | ) | |
| | ) | |
| *Defendants.* | ) | |

The undersigned, as Attorney for Defendant City of Charlotte, accepts on behalf of

Defendant City of Charlotte, service of the Summons and Complaint in the above-entitled

action, receipt of which is hereby acknowledged. By this acceptance of service, this

Defendant waives any further service requirements that may exist under the North

Carolina Rules of Civil Procedure.

This the 27ᵗʰ day of May 2016.

Robert E. Hagemann, NCBN: 13894
Charlotte Mecklenburg
Government Center
600 East Fourth Street
Charlotte, NC 28202
Telephone: (704) 336-2254
rhagemann@charlottenc.gov

# STATE OF NORTH CAROLINA

_____Mecklenburg_____ County

File No.

JUN 1 4 2016

16CVS8609

FILED

2016 JUN 13 AM 8: 35

MECKLENBURG COUNTY, C.S.C.

BY

In The General Court Of Justice
☐ District ☒ Superior Court Division

*Name Of Plaintiff*
Timothy Scott Bridges

*Address*
c/o David S. Rudolf, 225 E. Worthington Ave.

*City, State, Zip*
Charlotte, NC 28203

**VERSUS**

*Name Of Defendant(s)*
City of Charlotte, Larry Snider, Cheryl Horner, Elinos Whitlock, and Kathleen Ramseur

## CIVIL SUMMONS
☐ ALIAS AND PLURIES SUMMONS (ASSESS FEE)

G.S. 1A-1, Rules 3, 4

*Date Original Summons Issued*

*Date(s) Subsequent Summons(es) Issued*

**To Each Of The Defendant(s) Named Below:**

*Name And Address Of Defendant 1*
Larry Snider

Larry Snider
Anuvia Prevention and Recovery Center
100 Billingsley Road
Charlotte, NC 28211

## A Civil Action Has Been Commenced Against You!

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

*Name And Address Of Plaintiff's Attorney (If None, Address Of Plaintiff)*
David S. Rudolf and Sonya Pfeiffer
225 E. Worthington St., Ste. 200
Charlotte, NC 28203

*Date Issued*
5/10/16

*Time*
2:05
☐ AM
☐ PM

*Signature*

☐ Deputy CSC  ☐ Assistant CSC  ☐ Clerk Of Superior Court

☐ **ENDORSEMENT (ASSESS FEE)**
This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days.

*Date Of Endorsement*

*Time*
16 JUN 2:07
☐ AM
☐ PM

*Signature*

☐ Deputy CSC  ☐ Assistant CSC  ☐ Clerk Of Superior Court

MCSO-16JUN 1-14:32

**NOTE TO PARTIES:** *Many counties have MANDATORY ARBITRATION programs in which most cases where the amount in controversy is $15,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

MECKLENBURG
SHERIFF'S OFFICE
JUN 02 2016
PAID

*(Over)*

AOC-CV-100, Rev. 6/11
© 2011 Administrative Office of the Courts

## RETURN OF SERVICE

I certify that this Summons and a copy of the complaint were received and served as follows:

### DEFENDANT 1

| Date Served | Time Served | | Name Of Defendant |
|---|---|---|---|
| 6-08-16 | 1:15 ☐ AM ☑ PM | | harry Snider |

☑ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

harry Snider
100 Billingsley Rd clt, NC 28211

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| Date Served | Time Served | | Name Of Defendant |
|---|---|---|---|
| | ☐ AM ☐ PM | | |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason.

| Service Fee Paid | Signature Of Deputy Sheriff Making Return |
|---|---|
| $ | D. J. Wendham LS56 |
| Date Received | Name Of Sheriff (Type Or Print) |
| 6-08-16 | Irwin Carmichael |
| Date Of Return | County Of Sheriff |
| 6-09-16  1315 hrs | Mecklenburg |

AOC-CV-100, Side Two, Rev. 6/11
© 2011 Administrative Office of the Courts

# STATE OF NORTH CAROLINA

File No.

16CVS8609

_____ Mecklenburg _____ County

In The General Court Of Justice
☐ District ☒ Superior Court Division

*Name Of Plaintiff*
Timothy Scott Bridges

*Address*
c/o David S. Rudolf, 225 E. Worthington Ave.

*City, State, Zip*
Charlotte, NC 28203

## CIVIL SUMMONS
☐ **ALIAS AND PLURIES SUMMONS (ASSESS FEE)**

G.S. 1A-1, Rules 3, 4

### VERSUS

*Name Of Defendant(s)*
City of Charlotte, Larry Snider, Cheryl Horner, Elinos Whitlock, and Kathleen Ramseur

*Date Original Summons Issued*

*Date(s) Subsequent Summons(es) Issued*

## To Each Of The Defendant(s) Named Below:

*Name And Address Of Defendant 1*
Elinos Whitlock
Charlotte Police Crime Lab
601 East Trade Street
Charlotte,

*Name And Address Of Defendant 2*
Elinos Alton Whitlock
7909 Philadelphia Court #101
Charlotte, NC 28216

### A Civil Action Has Been Commenced Against You!

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

*Name And Address Of Plaintiff's Attorney (If None, Address Of Plaintiff)*
David S. Rudolf and Sonya Pfeiffer
225 E. Worthington St., Ste. 200
Charlotte, NC 28203

*Date Issued*
5/10/16

*Time*
2:08
☐ AM
☐ PM

*Signature*

☐ Deputy CSC   ☐ Assistant CSC   ☐ Clerk Of Superior Court

☐ **ENDORSEMENT (ASSESS FEE)**
This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days.

*Date Of Endorsement*

*Time*
☐ AM
☐ PM

*Signature*

☐ Deputy CSC   ☐ Assistant CSC   ☐ Clerk Of Superior Court

**NOTE TO PARTIES:** *Many counties have MANDATORY ARBITRATION programs in which most cases where the amount in controversy is $15,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

AOC-CV-100, Rev. 6/11
© 2011 Administrative Office of the Courts

(Over)

JUN 02 2016

## RETURN OF SERVICE

I certify that this Summons and a copy of the complaint were received and served as follows:

### DEFENDANT 1

| Date Served | Time Served | | Name Of Defendant |
|---|---|---|---|
| 6/11/16 | 0841 | ☑AM ☐ PM | ELINOS WHTLCCK |

☑ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| Date Served | Time Served | | Name Of Defendant |
|---|---|---|---|
| | | ☐ AM ☐ PM | |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason.

| Service Fee Paid | Signature Of Deputy Sheriff Making Return |
|---|---|
| $ | A. Carver x2801 |
| Date Received | Name Of Sheriff (Type Or Print) |
| 6/8/16 | IRWIN CARMICHAEL |
| Date Of Return | County Of Sheriff |
| 6/11/16 | Mecklenburg |

AOC-CV-100, Side Two, Rev. 6/11
© 2011 Administrative Office of the Courts

JUN 1 6 2016

# STATE OF NORTH CAROLINA

File No.
16CVS8609

_____ Mecklenburg _____ County

In The General Court Of Justice
☐ District ☒ Superior Court Division

| | |
|---|---|
| *Name Of Plaintiff*<br>Timothy Scott Bridges | 2016 JUN 15 A 11: 10 |
| *Address*<br>c/o David S. Rudolf, 225 E. Worthington Ave. | **CIVIL SUMMONS** |
| *City, State, Zip*<br>Charlotte, NC 28203 | ☐ ALIAS AND PLURIES SUMMONS (ASSESS FEE) |
| **VERSUS** | BY _____ G.S. 1A-1, Rules 3, 4 |
| *Name Of Defendant(s)*<br>City of Charlotte, Larry Snider, Cheryl Horner, Elinos Whitlock, and Kathleen Ramseur | *Date Original Summons Issued* |
| | *Date(s) Subsequent Summons(es) Issued* |

**To Each Of The Defendant(s) Named Below:**

| |
|---|
| *Name And Address Of Defendant 1*<br>Kathleen Ramseur<br><br>Charlotte Police Lab<br><br>601 East Trade Street<br><br>Charlotte,                              NC  28202 |

Kathleen Ramseur
6323 Bridlewood Lane
Charlotte, NC 28215

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served.  You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| | | |
|---|---|---|
| *Name And Address Of Plaintiff's Attorney (If None, Address Of Plaintiff)*<br>David S. Rudolf and Sonya Pfeiffer<br><br>225 E. Worthington St., Ste. 200<br><br>Charlotte, NC 28203 | *Date Issued*<br>5/10/16 | *Time*<br>2:08  ☐ AM ☐ PM |
| | *Signature*<br>_Jesse Sundeen_ | |
| | ☐ Deputy CSC  ☐ Assistant CSC  ☐ Clerk Of Superior Court | |

| | | |
|---|---|---|
| ☐ **ENDORSEMENT (ASSESS FEE)**<br>This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | *Date Of Endorsement* | *Time*<br>GP '16 JUN 2PM12:06  ☐ AM ☐ PM |
| | *Signature* | |
| | ☐ Deputy CSC  ☐ Assistant CSC  ☐ Clerk Of Superior Court | |

MCSO~'16 JUN 1 14:32

MECKLENBURG CO.

JUN 02 2016

PAID
CK# 30150

**NOTE TO PARTIES:** *Many counties have MANDATORY ARBITRATION programs in which most cases where the amount in controversy is $15,000 or less are heard by an arbitrator before a trial.  The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

AOC-CV-100, Rev. 6/11
© 2011 Administrative Office of the Courts

(Over)

AMT $ 128

## RETURN OF SERVICE

I certify that this Summons and a copy of the complaint were received and served as follows:

### DEFENDANT 1

| Date Served | Time Served | | Name Of Defendant |
|---|---|---|---|
| 6-13-16 | 0725 | ☒ AM ☐ PM | Kathleen Rumseur |

☒ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

6323 Bridlewood Ln.

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| Date Served | Time Served | | Name Of Defendant |
|---|---|---|---|
| | | ☐ AM ☐ PM | |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason.

| Service Fee Paid | Signature Of Deputy Sheriff Making Return |
|---|---|
| $ | **E. Elmendorf - X3193** |
| Date Received  6-8-16 | Name Of Sheriff (Type Or Print)  **Irwin Carmichael** |
| Date Of Return  6-13-16 | County Of Sheriff  **Mecklenburg** |

AOC-CV-100, Side Two, Rev. 6/11
© 2011 Administrative Office of the Courts

# STATE OF NORTH CAROLINA  FILED

Mecklenburg County 2016 JUN 27 PM 2: 24

LISA T. LUTZ, C.S.C.

In The General Court Of Justice
☐ District  ☒ Superior Court Division

**Name Of Plaintiff**
Timothy Scott Bridges

**Address**
c/o David S. Rudolf, 225 E. Worthington Ave.

**City, State, Zip**
Charlotte, NC 28203

**VERSUS**

**Name Of Defendant(s)**
City of Charlotte, Larry Snider, Cheryl Horner, Elinos Whitlock, and Kathleen Ramseur

# CIVIL SUMMONS
☒ **ALIAS AND PLURIES SUMMONS (ASSESS FEE)**

G.S. 1A-1, Rules 3, 4

**Date Original Summons Issued**
05-10-2016

**Date(s) Subsequent Summons(es) Issued**

## To Each Of The Defendant(s) Named Below:

**Name And Address Of Defendant 1**
Cheryl Horner
4932 Antioch Church Road

Matthews                    NC  28104

**Name And Address Of Defendant 2**

RECEIVED
UNION COUNTY

JUN 20 2016

118125

SHERIFF'S OFFICE
CIVIL BUREAU

### A Civil Action Has Been Commenced Against You!

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served.  You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

**Name And Address Of Plaintiff's Attorney (If None, Address Of Plaintiff)**
David S. Rudolf and Sonya Pfeiffer
225 E. Worthington St., Ste. 200
Charlotte, NC 28203

**Date Issued**
6/14/16

**Time**
10: 30   ☐ AM  ☐ PM

**Signature**

☐ Deputy CSC   ☐ Assistant CSC   ☐ Clerk Of Superior Court

---

☐ **ENDORSEMENT (ASSESS FEE)**
This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days.

**Date Of Endorsement**

**Time**
☐ AM  ☐ PM

**Signature**

☐ Deputy CSC   ☐ Assistant CSC   ☐ Clerk Of Superior Court

**NOTE TO PARTIES:** *Many counties have MANDATORY ARBITRATION programs in which most cases where the amount in controversy is $15,000 or less are heard by an arbitrator before a trial.  The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

AOC-CV-100, Rev. 6/11
© 2011 Administrative Office of the Courts

(Over)

## RETURN OF SERVICE

I certify that this Summons and a copy of the complaint were received and served as follows:

### DEFENDANT 1

| Date Served | Time Served | | Name Of Defendant |
|---|---|---|---|
| 06/21/2016 | 3:25 ☐ AM ☑ PM | | Cheryl Horner |

☑ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

Cheryl Horner
4932 Antioch Church Rd Matthews NC 28104

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| Date Served | Time Served | | Name Of Defendant |
|---|---|---|---|
| | ☐ AM ☐ PM | | |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason.

| Service Fee Paid | Signature Of Deputy Sheriff Making Return |
|---|---|
| $ | |
| Date Received | Name Of Sheriff (Type Or Print) |
| 06/20/2016 | Eddie Cathey |
| Date Of Return | County Of Sheriff |
| 06/22/2016 | Union |

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

JUL 0 2 2016

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
16-CVS-8609

FILED

2016 JUL -6 P 3:47

MECKLENBURG CO., C.S.C.

BY

TIMOTHY SCOTT BRIDGES,

             Plaintiff,

    v.

CITY OF CHARLOTTE, LARRY SNIDER,
in his individual and official capacities and
in his supervisory capacity as the Capt. In
charge of the Felony Investigations Bureau
of the Charlotte Police Department,
CHERYL HORNER, in her individual and
official capacities, ELINOS WHITLOCK, in
his individual and official capacities, and
KATHLEEN RAMSEUR, in her individual
and official capacities,

             Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**MOTION FOR EXTENSION OF TIME
FOR DEFENDANT ELINOS
WHITLOCK TO ANSWER OR
OTHERWISE RESPOND TO
PLAINTIFF'S COMPLAINT**

## MOTION

    NOW COMES the Defendant, ELINOS WHITLOCK, acting by and through his

attorneys, Cranfill Sumner & Hartzog, LLP, and respectfully shows unto the Court that

additional time is needed for investigation and preparation of pleadings in the above case and

respectfully moves the Court for a thirty (30) day extension of time, within which to serve

answer or otherwise plead. The Defendant was served with the Summons and Complaint on or

after June 11, 2016.

509338 v1

This the 6 day of July, 2016.

CRANFILL SUMNER & HARTZOG LLP

BY: _____ (For)
Patrick H. Flanagan, NC Bar #17407
Attorneys for Defendant Elinos Whitlock
P.O. Box 30787
Charlotte, NC 28230
Telephone (704) 332-8300
Facsimile (704) 332-9994
phf@cshlaw.com

509338 v1

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
16-CVS-8609

TIMOTHY SCOTT BRIDGES,

         Plaintiff,

    v.

CITY OF CHARLOTTE, LARRY SNIDER,
in his individual and official capacities and in
his supervisory capacity as the Capt. In
charge of the Felony Investigations Bureau of
the Charlotte Police Department, CHERYL
HORNER, in her individual and official
capacities, ELINOS WHITLOCK, in his
individual and official capacities, and
KATHLEEN RAMSEUR, in her individual
and official capacities,

         Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**ORDER**

---

## **ORDER**

    In the above-entitled action Defendant ELINOS WHITLOCK (herein after "Defendant"),

having for good cause shown, made application for additional time within which to serve answer

or otherwise plead;

    **IT IS NOW ORDERED** that Defendant be and are hereby granted additional time

within which to serve answer or otherwise plead to and including the 10th day of August, 2016.

    This the 6 day of ~~August~~ Jul , 2016.

    Timothy R. _____

CLERK OF SUPERIOR COURT
MECKLENBURG COUNTY

509338 v1

## CERTIFICATE OF SERVICE

This is to certify that the undersigned has this day served the attached Motion and Order for Extension of Time for Defendant to Answer or Otherwise Plead to Plaintiff's Complaint on all parties to this cause by:

_____ Hand delivering a copy hereof to the attorney for each said party addressed as follows:

__X__ Depositing a copy hereof, postage prepaid, in the United States Mail, addressed to the attorney for each said party as follows:

_____ Depositing a copy hereof with a nationally recognized overnight courier service, for overnight delivery, addressed to the attorney for each said party as follows:

_____ Telecopying a copy hereof to the attorney for each said party as follows:

> David S. Rudolf
> Sonya Pfeiffer
> **Rudolf Widenhouse**
> 225 East Worthington Avenue, Suite 200
> Charlotte, NC 28203

This the 7 day of July, 2016

CRANFILL SUMNER & HARTZOG LLP

BY: _____ (For)
Patrick H. Flanagan, NC Bar #17407
Attorneys for Defendant Elinos Whitlock
P.O. Box 30787
Charlotte, NC 28230
Telephone (704) 332-8300
Facsimile (704) 332-9994
phf@cshlaw.com

509338 v1